IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MATTHEW PIERSON,
    *Plaintiff*,

v.

BICI FITNESS, LLC, *et al.*,
    *Defendants.*

No. 25-cv-2332-ABA

**MEMORANDUM OPINION**

The Gran Fondo National Series is a series of cycling races held around the country. The 2023 championship was held in Maryland. There were "timed" sections, which riders sought to complete as quickly as possible, and "untimed" sections, which riders were required to complete but where they were not competing for speed. During "timed" sections, intersections were blocked and non-race vehicle traffic was excluded from the course. During "untimed" sections, in contrast, riders were told that intersections would not be blocked—that they were on their own to avoid vehicle traffic.

But Plaintiff Matthew Pierson contends things were not quite so black-and-white that day. He was one of the competitors and contends that as riders entered one "untimed" section, race organizers continued to block intersections—twenty of them in a row. He contends this led him (and other riders) to believe that other intersections ahead would also be blocked. But when Mr. Pierson attempted to cross one of the intersections, where he says a race official on a motorcycle signaled the lead riders not to stop and instead waved them through the intersection, he was struck by a car and suffered serious injuries. He has sued BICI Fitness, LLC (d/b/a Gran Fondo National Series) ("BICI") and USA Cycling Inc ("USAC"). As discussed below, some of Plaintiff's

1

claims are foreclosed by a waiver-of-liability provision in the contractual documents he signed as a participant, but his gross negligence claim may proceed to discovery.

I.   **BACKGROUND**

   A.   **Plaintiff's allegations**

Because the pending motions arise at the pleadings stage, the Court accepts as true the allegations in Plaintiff's complaint (ECF No. 5) and any reasonable inferences from those allegations must be drawn in Mr. Pierson's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). With that standard of review in mind, the Court recounts Mr. Pierson's allegations regarding his participation in the September 2023 Gran Fondo race.

A resident of Leesburg, Virginia, Mr. Pierson is a cyclist who qualified and registered for the 2023 Gran Fondo championship. ECF No. 5 ¶¶ 5, 8. The race "was managed and/or produced by Defendant BICI Fitness, and sanctioned and/or co-managed by Defendant USAC." *Id.* ¶ 8. Mr. Pierson acknowledges that some dangers are inherent to competitive cycling, but contends that both BICI and USAC had duties to ensure riders' safety. USAC had a duty "to ensure that bicycle races would be safe, that the race rules would be followed, and that cyclists would not be struck by motor vehicles." *Id.* ¶ 12. And BICI "was responsible for managing the race, for ensuring that the race rules would be followed, for hiring, training, and supervising motorcycle officials, and for controlling the racecourse so as to be reasonably safe for competing cyclists." *Id.* ¶ 13.

As noted above, the Gran Fondo race featured "timed" and "untimed" sections. *Id.* ¶ 10. "In the 'timed' sections, riders were instructed that the rules of the road did not apply to the racers." *Id.* "The riders were informed that in 'untimed' sections, the rules

of the road were to be obeyed." *Id.* Plaintiff alleges that "it was the duty of Defendant BICI Fitness to maintain racecourse security, including the placement of course marshals, flaggers, and/or police at all 'timed' intersections through which competing cyclists would be crossing." *Id.* ¶ 14. He further contends that, given the timed/untimed format, BICI and its agents also had a duty "*not* to control any intersection in the 'untimed' portions of the race" to maintain, among other things, riders' understanding "that the rules of the road were in place" during those segments. *Id.* ¶ 15 (emphasis added).

The portion of the race route where the crash occurred, outside of Frederick, Maryland, had been designated in advance as an "untimed" segment. *Id.* ¶¶ 9, 18. Mr. Pierson was in "the lead group of riders" as they entered that untimed segment. *Id.* ¶ 16. The riders had been led to believe the race organizers would only be blocking traffic or otherwise providing a protective escort to riders during timed sections. *Id.* But Mr. Pierson alleges that as the lead riders departed Frederick and entered that untimed segment, course marshals went ahead and blocked traffic. *Id.* He contends that, at twenty intersections in a row during that supposedly "untimed" segment, course officials were not only "present" but "controlled motor vehicle traffic and instructed the riders to pass through traffic signals without stopping." *Id.* He describes the marshals as having "create[ed] a 'rolling enclosure' with the lead group of riders." *Id.*

After the lead riders, including Mr. Pierson, passed the twentieth intersection while traveling on Stottlemeyer Road, they approached the intersection of Maryland Route 77. *Id.* ¶ 18. As they approached that intersection, one "motorcycle official pulled ahead of the riders." *Id.* In what Mr. Pierson describes as the culmination of a series of grossly negligent decisions by race officials, that motorcycle official then "signal[ed] that

3

the intersection was cleared." *Id.* Mr. Pierson alleges that, "[b]ased on the officials' actions at the prior 20 intersections, this movement created a clear signal to Mr. Pierson and the other lead rider that the intersection of Maryland Route 77 and Stottlemeyer Road had been cleared for them to ride through without obeying the stop sign." *Id.* In other words, although the racers had been told that "untimed" sections would be open to other traffic, and that riders had to obey traffic laws during those sections, he contends that the race officials had implemented, and conveyed to riders, a "new standard"—at least for that portion of that untimed section, and at least for the lead riders. *Id.* ¶ 19.

But "the course was not closed," and no one was actually blocking cars on Maryland Route 77 from crossing Stottlemeyer Road. *Id.* ¶¶ 16, 20. And although the motorcycle official "signal[ed] that the intersection was cleared," *id.* ¶ 18, it was not. A driver traveling along Maryland Route 77 at approximately 50 miles per hour crashed into Mr. Pierson and another cyclist. *Id.* ¶ 21. "As a direct and proximate result of the crash, Mr. Pierson suffered catastrophic injuries." *Id.* ¶ 22.

Based on those injuries, Mr. Pierson has sued BICI and USAC for negligence (specifically, negligent hiring, training and supervision of race officials) and gross negligence. Mr. Pierson originally filed his case in the Circuit Court for Frederick County, Maryland; the operative complaint remains the one he filed in that court. ECF No. 5. Defendants removed the case to this Court based on diversity of citizenship; Mr. Pierson is a citizen of Virginia, BICI is a citizen of Pennsylvania, and USAC is a citizen of Colorado. ECF No. 5 ¶¶ 5–7.

### B. The exculpatory provisions

Mr. Pierson did not just show up and join the race. As one would expect, in addition to qualifying for the championship race, he filled out paperwork before the race

began. As discussed below, the parties agree that although they have not yet begun discovery, the Court may also consider the contracts Mr. Pierson signed for the race, for purposes of assessing the scope and enforceability of those contracts' exculpatory provisions. *See* n. 5, *infra*.

Most of the provisions in the contracts he signed are not presently relevant. One potentially relevant portion is a choice-of-law provision in one of Mr. Pierson's contracts with USAC: "This agreement shall be governed by and construed under the laws of Colorado, without regard to its choice of law rules" (ECF No. 10-3 at 4).[1] That will be discussed below. Of greater relevance for current purposes are several exculpatory provisions, often referred to as liability waivers or releases.

The **BICI Waiver** applied to "any and all liabilities, claims, actions, causes of action, demands, lawsuits, and injuries of every kind and nature whatsoever" (other than "gross negligence or willful misconduct") "arising out of or relating to the presence or participation of [Pierson] at the event . . . whether arising from negligence of [BICI] or otherwise." ECF No. 10-2 at 3.[2] USAC required that riders complete two waivers. The first, titled "**USAC Online Waiver**," released USAC from "any claims that may arise out of or are related to my participation in an Event, including claims arising from the ordinary negligence of [USAC]." ECF No. 10-3 at 3. The "**USAC License Waiver**"

---

[1] References to page numbers in the parties' filings are to the page numbers in the CM/ECF headers, which do not necessarily align with the parties' original numbering.

[2] As discussed below, the carve-out for gross negligence and willful misconduct was not, strictly speaking, necessary; under both Maryland and Colorado law, a person may not lawfully exculpate another person for gross negligence or willful misconduct.

released USAC "from any and all rights and claims including claims arising from [USAC's] own negligence to the maximum extent permitted by law." ECF No. 10-3 at 5.[3]

## II. DISCUSSION

Mr. Pierson's complaint contains six counts. The first two are titled "agency" counts; his counsel confirmed at the hearing that those counts do not assert independent causes of action, but rather make clear that he considers both BICI and USAC to be liable for the conduct of each other and of all of the people who organized and managed the race. The substantive causes of action are for "negligent hiring, training, and supervision" (against BICI and USAC, counts 5 and 6 respectively) and gross negligence (against BICI and USAC, counts 3 and 4 respectively). Defendants have filed a motion to dismiss all of Mr. Pierson's claims. They contend that the negligent hiring, training, and supervision claims are barred by the exculpatory provisions described above, and that Mr. Pierson's allegations are insufficient to state a claim for gross negligence.

### A. Negligent hiring, training, and supervision (Counts 5 & 6)

The three exculpatory clauses above, which Mr. Pierson concedes he signs and are enforceable (at least "as to simple negligence," ECF No. 11 at 14), all undisputedly exculpate Defendants for negligence claims. *See, e.g.*, *BJ's Wholesale Club, Inc. v. Rosen*, 435 Md. 714, 724 (2013) ("In the absence of legislation to the contrary,

---

[3] The USAC Online Waiver also contained a forum selection clause: "Any legal suit, action, or proceeding arising out of or relating to this agreement shall be instituted in the federal court located in Denver, Colorado, or state courts located in Colorado Springs and El Paso County. Each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding." ECF No. 10-3 at 4. Neither party has sought to enforce that provision; the question of whether they have definitively waived enforcement of it is not presented by the pending motion to dismiss.

exculpatory clauses are generally valid, and the public policy of freedom of contract is best served by enforcing the provisions of the clause") (quoting *Wolf v. Ford,* 335 Md. 525, 531 (1994)); *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004) (holding that exculpatory provisions are enforceable so long as they do not waive claims for "willful and wanton negligence," are "expressed in clear and unambiguous language" and "fairly entered into," and do not violate public policy).[4]

As to this issue, the parties agree that the Court may and should consider the contractual documents containing the exculpatory provisions for purposes of adjudicating whether Plaintiff's negligent hiring/training/supervision claims may proceed. ECF No. 12 at 6 n.11 (Defendants: "As the terms of the waivers governed Plaintiff's participation in the event at issue in the Complaint, and there is no dispute as to their authenticity, the waivers could properly be considered as integral to Plaintiff's claims and allegations in the Complaint, without converting this Motion to Dismiss into one for Summary Judgment."); ECF No. 11 at 4, 14 (Plaintiff not disputing that the Court may partially convert the motion to dismiss to summary judgment, for purposes of considering the exculpation provisions at this stage).[5]

---

[4] Because, as explained herein, the result is the same under Maryland and Colorado law, the Court need not decide the applicability or effect of the choice-of-law clause in the USAC Online Waiver on Counts 5 and 6. *See Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013) ("Choice of law analysis becomes necessary only if the relevant laws of the different states lead to different outcomes.") (cleaned up).

[5] Under Federal Rule of Civil Procedure 12(d), a motion to dismiss "must be treated as one for summary judgment under Rule 56" if "matters outside the pleadings are presented to and not excluded by the court." "All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). The waiver agreements were not attached to or referenced in Plaintiff's complaint. Counsel for the parties were given an opportunity to address the waivers in their

Thus, Mr. Pierson acknowledges, as he must given the plain language of the waivers and Maryland and Colorado law, that the waivers apply and are enforceable to claims that Defendants were negligent in how they organized and managed the race itself. ECF No. 11-1 at 14 ("Maryland Courts have upheld exculpatory clauses as enforceable as to simple negligence."). Defendants, for their part, acknowledge, as they must, that the waivers do *not* bar claims that Defendants acted with *gross* negligence. ECF No. 10-1 at 15. But where does that leave Mr. Pierson's claims that BICI and USAC were negligent in how they hired, trained and supervised the individuals who were managing the race?

Mr. Pierson draws a distinction between two types of negligent conduct that falls short of gross negligence. (His claims for gross negligence are discussed in the next section.) On one hand, he argues that Defendants were negligent in how they conducted the race itself. He does not dispute that such a claim would be barred by the plain language of the exculpatory provisions. On the other hand, he argues that Defendants were also negligent in how they selected, trained and supervised the personnel who ran the race. Mr. Pierson argues that the latter claims were outside the scope of the

---

briefing and at the hearing, and both sides confirmed there is no dispute with their authenticity or that Mr. Pierson signed them. The parties also agreed that it is appropriate at this stage for the Court to consider the effect of the exculpatory provisions. The Court will thus construe the motion to dismiss to be a motion for summary judgment on only the limited question of whether the exculpatory agreements that Mr. Pierson undisputedly signed precludes his negligent hiring claims as a matter of law. *See Randolph v. Caruso Homes, Inc.*, Case No. 13-cv-2069-RWT, 2014 WL 4661985, at *2 (D. Md. Sept. 16, 2014) (converting a motion to dismiss based upon a liability release into a motion for summary judgment). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)

exculpatory provisions. Those waivers, Mr. Pierson argues, "do[] not concern Defendants' duty to ensure that it would properly hire, train, and supervise its employees, including those individuals who would be responsible for the safety of competing cyclists like Mr. Pierson." ECF No. 11-1 at 16; *see also id.* at 17 ("[H]e understood that there was a possibility that he could be injured while competing, however, Mr. Pierson did not reasonably believe that he would be placed in danger by Defendants' failure to properly hire, train, and supervise its employees, including the course marshals who were responsible for course safety."). And he contends Defendants were negligent not only in how they conducted the race itself, but also with regard to hiring and training, including that Defendants "hired course marshals for this particular race within one (1) week of the race itself," "did little to no pre-race training of the course marshals," and "had little to no supervision over the course marshals." *Id.* at 18. Thus, he contends, particularly because exculpatory clauses must be construed narrowly, *id.* at 19 (citing *Adloo v. H.T. Brown Real Estate*, 344 Md. 254, 264 (1996)), there was "no meeting of the minds" regarding exculpation of Defendants for "claims of negligent hiring, training, and supervision." *Id.*

The plain language of the exculpatory provisions here is incompatible with the distinction Mr. Pierson asks this Court to draw. Plaintiff agreed that he would not hold Defendants responsible for negligent conduct by Defendants or their agents that fell short of willful misconduct or gross negligence. Organizing and running a race like the Gran Fondo championship requires people, either hired staff or volunteers. The language in the exculpatory clauses is broad, involving release of all claims related to personal injuries that riders sustained during a race as a result of negligent conduct (as opposed to grossly negligent conduct) by BICI and USAC. The BICI Waiver expressly

9

applies to claims "arising out of or relating to the presence or participation of a releasor at the event or from a releasor traveling to and from the event." ECF No. 10-2 at 3. It further specifies that this release extends to "negligence of the releasees," and defines the released parties to include BICI's "agents." *Id.* This broad release clearly includes ordinary negligence claims against both BICI and the race officials to the extent they were acting as BICI's agents. Similarly, the USAC Online Waiver applies to "claims that may arise out of or are related to . . . participation in an Event" (ECF No. 10-3 at 3) and the USAC License Waiver applies to claims "arising from [USAC's] own negligence" based on riders' "participation" in the "event" (*id.* at 5). The USAC waivers also specify that Mr. Pierson agreed to "release . . . USAC . . . and [its] . . . agents . . . from any claims that may arise out of or are related to my participation in an Event, including claims arising from the ordinary negligence of Releasees." ECF No. 10-3 at 3; *see also id.* at 5 (nearly identical).

      Under Maryland law, although exculpatory clauses are construed narrowly, they "need not contain or use the word 'negligence' or any other 'magic words,'" but are instead "sufficient . . . as long as [their] language clearly and specifically indicates the intent to release the defendant from liability for personal injury caused by the defendant's negligence." *Adloo*, 344 Md. at 266 (quotations omitted). Colorado law contains essentially the same standard. *Chadwick*, 100 P.3d at 467 (requiring that exculpatory clauses be "expressed in clear and unambiguous language"). Mr. Pierson's claims that Defendants were negligent in how and when they hired staff, and how they trained and supervised them (or failed to do so) regarding how to manage the untimed sections of the race, are still claims that Defendants acted negligently, and are claims that arose from his participation in the Gran Fondo race. Accordingly, Defendants are

entitled to summary judgment on counts 5 and 6 of Mr. Pierson's complaint. If Defendants' hiring, training and supervision of race personnel was *grossly* negligent, the exculpatory clauses undisputedly will not apply, but counts 5 and 6 invoke simple negligence, not gross negligence, and thus are foreclosed by the liability releases to which Mr. Pierson agreed before the race.

### B.     Gross negligence (Counts 3 & 4)

Mr. Pierson alleges that Defendants were not only negligent in how they conducted the race and hired, trained and supervised race personnel. He contends their conduct was *grossly* negligent. Defendants agree that Mr. Pierson's gross negligence claims are not barred by the exculpatory provisions discussed above. *See, e.g.*, ECF No. 10-1 at 15. But they argue the gross negligence claims should still be dismissed because they fail to plead the elements for such claims. This argument invokes the *Twombly* standard, under which a pleading must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. In reviewing a Rule 12(b)(6) motion, a court must "accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quotations omitted).

Under Maryland law, a gross negligence claim requires a plaintiff to plead and prove "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another"—in other words, "a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Barbre v. Pope*, 402 Md. 157, 187 (2007) (quoting *Liscombe v. Potomac Edison Co.,* 303 Md. 619, 635 (1985)). "Gross negligence is not just big negligence," but instead

11

implies "wanton and reckless disregard for . . . life." *Stracke v. Estate of Butler*, 465 Md. 407, 426 (2019) (quotations omitted). Colorado courts have adopted a similar standard. *See Hamill v. Cheley Colorado Camps, Inc.*, 262 P.3d 945, 954 (Colo. App. 2011) ("Gross negligence is willful and wanton conduct, that is, action committed recklessly, with conscious disregard for the safety of others"); *Stamp v. Vail Corporation*, 172 P.3d 437, 449 (Colo. 2007) ("Conduct is willful and wanton if it is 'a dangerous course of action' that is consciously chosen 'with knowledge of facts, which to a reasonable mind creates a strong probability that injury to others will result.'") (quoting *Steeves v. Smiley*, 354 P.2d 1011, 1014 (Colo. 1960)).

Thus, the question presented is this: does the complaint state cognizable claims for gross negligence under Maryland and/or Colorado law? As explained above, the Court must not only accept all of Mr. Pierson's factual allegations as true, but must draw all reasonable inferences from those allegations in his favor. Those allegations and inferences describe a series of acts, omissions and events that satisfy the standard for gross negligence under both Maryland and Colorado law (and thus the Court need not decide, at least at this stage, which state's law governs Plaintiff's gross negligence claims).

Mr. Pierson alleges that before the race, Defendants and their agents conveyed to riders that during timed sections they could (and should) disregard traffic laws, and that they could safely pass directly through intersections, including at high speed, without stopping or slowing down.[6] He says Defendants also conveyed to riders that there would

---

[6] In their motion, Defendants argued that Plaintiff did not adequately plead an agency relationship between the race officials and Defendants sufficient to establish vicarious liability. ECF No. 10-1 at 19–21. Defendants frame this argument as a failure to state an

be a clear delineation between timed and untimed sections, and that during untimed sections they not only would have to obey traffic laws but would be responsible for their own safety, especially at intersections. Mr. Pierson does not contend that Defendants were obligated to block intersections during untimed sections; to the contrary, he contends that, particularly with this race containing both timed and untimed sections, Defendants' should *not* have blocked intersections during untimed sections. He contends that by blocking twenty intersections in a row for the lead riders during a section that had previously been designated "untimed" and thus unprotected, race officials led those riders (including Mr. Pierson) to believe that race officials had effectively converted that section to a "timed" section—not in the sense that they were now competing for speed, but that intersections *were* being blocked, and that riders did *not* need to stop or slow at intersections to check for cross-traffic. This implied conversion, he contends, signaled to him and the other lead riders to speed along and assume that upcoming intersections would also be blocked. That series of decisions by race officials, he alleges, constituted intentional decisions "in reckless disregard of the consequences" for the riders' safety, *see Barbre*, 402 Md. at 187, in "wanton and reckless disregard for . . . life," *Stracke*, 465 Md. at 426, in other words "a dangerous course of

---

agency claim, targeting Plaintiff's first two counts. As stated above, Plaintiff clarified that his "agency" claims are not standalone, substantive claims. To the extent Defendant meant to challenge the pleading of an agency relationship for purposes of the negligent hiring or gross negligence claims, the Court rejects that argument because Plaintiff's complaint sufficiently alleges an agency relationship. *See, e.g.*, ECF No. 5 ¶ 13 ("Defendant BICI was responsible for . . . hiring, training, and supervising motorcycle officials"); *id.* ¶ 39 ("it was the duty of Defendant [USAC] to ensure that Defendant BICI would hire qualified course marshals" and deploy them to ensure course safety).

action" that the course marshals "consciously chose[]" despite a "strong probability that injury to others will result," *Stamp*, 172 P.3d at 449.

If those were all the factual allegations, the question of whether the complaint states a cognizable claim for gross negligence would be a close one. But Mr. Pierson has another allegation: that the motorcycle official who had raced ahead of the lead riders after that twentieth blocked intersection, and who arrived at the Route 77 intersection before the lead riders, stopped at that intersection and not only "signal[ed] that the intersection was cleared," ECF No. 5 ¶ 18, but "waved competing cyclists, including Mr. Pierson, through the intersection." *Id.* ¶ 34. Defendants' alleged conscious decisions to block the extended series of intersections in the untimed section in contradiction to the previously announced course rules, and then to wave the competing cyclists through the Route 77 intersection without actually blocking that intersection, are sufficient at the pleading stage to state claims for gross negligence that may proceed to discovery, and thus Defendants' motion to dismiss counts 3 and 4 will be denied.

### C.     Contributory/comparative negligence, and assumption of risk

Finally, Defendants also argue that even if the complaint affirmatively states one or more causes of action, Defendants cannot be held liable because (1) Mr. Pierson assumed the risk of injuries when he participated in the race and (2) he was contributorily negligent by failing to obey the stop sign at the Route 77 intersection.

The discussion in the preceding sections mostly disposes of the first issue. Defendants are correct that, under Maryland law, when a person "(1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger," such voluntary action supports "an affirmative defense that completely bars a plaintiff's recovery." *Warsham v. James Muscatello, Inc.,* 189 Md. App. 620, 639

14

(2009). An assumption-of-risk defense, in the abstract, is conceptually distinct from enforcement of an exculpatory clause in a contract. But here the issues collapse—at least as presented by Defendants' motion to dismiss—because Defendants' argument for dismissal on assumption-of-risk grounds is that Mr. Pierson "signed multiple waivers prior to the event." ECF No. 10-1 at 27. As discussed above, the exculpatory clauses do preclude Plaintiff's negligence claims, and thus the Court need not reach the question of assumption of risk as to counts 5 and 6. And Maryland law makes clear that exculpatory clauses cannot be enforced to defeat gross negligence claims, and thus insofar as Defendants contend that Mr. Pierson assumed the risks associated with the race by signing the pre-race waivers, any such waiver does not apply to Plaintiff's gross negligence claims (counts 3 and 4).

In addition to their contract-based assumption-of-risk defense, Defendants also contend that Plaintiff's claims should be barred because participation in "a voluntary sporting event like that present in this case" bars negligence claims for the "inherent risks" of such an event. ECF No. 10-1 at 28–29. But such a defense only applies to bar claims arising from "risks that are the usual and foreseeable consequences of participation" in the sporting event. *Am. Powerlifting Ass'n v. Cotillo*, 401 Md. 658, 675 (2007). Construing the allegations in Plaintiff's complaint as true, the accident that occurred was not a usual and foreseeable occurrence.

That leaves Defendants' contributory negligence defense. That argument for dismissal is premised on Defendants' contention that Maryland law applies at least on that defense. After all, although Maryland and Colorado law are sufficiently congruent on the issues discussed above to render immaterial the question of which state's law applies to those issues (the enforceability and scope of exculpatory contracts, and on

15

what constitutes gross negligence), the parties agree that Colorado and Maryland law diverge on Defendants' contributory negligence defense. Colorado, like all but a few other states, has discarded contributory negligence in favor of a comparative negligence standard. Under Colorado law, a defendant's liability for personal injury is *diminished* by the degree to which the injured person's own "negligence or fault" contributed to the injury, Colo. Rev. Stat. Ann. § 13-21-111.5(1), and a plaintiff is barred from recovery only if his own negligence was at least "as great as the negligence of the person against whom recovery is sought," *id.* § 13-21-111(1). Thus, under Colorado law, even if a plaintiff was negligent in ways that contributed to an injury, the plaintiff may still recover damages (albeit not necessarily full damages) as long as a defendant was *more* negligent than the plaintiff. In contrast, Maryland continues to cling to a contributory negligence standard under which "contributory negligence on the part of a plaintiff completely bars recovery against a negligent defendant." *Wooldridge v. Price*, 184 Md. App. 451, 461 (2009).

If Colorado law applies, Defendants do not contend that comparative negligence would be a basis for dismissal at the pleadings stage (but rather will ultimately preclude or at least substantially diminish any recovery). But they argue that Maryland law applies to that issue, because the Colorado choice-of-law clause in the USAC Online Waiver is limited to contractual interpretation issues, as it states simply, "[t]his agreement shall be governed by and construed under the laws of Colorado, without regard to its choice of law rules" (ECF No. 10-3 at 4). And because the parties agree that Maryland law would apply here in the *absence* of an applicable choice-of-law clause, Defendants argue that they are entitled to dismissal at the pleadings stage on contributory negligence grounds because Mr. Pierson "admits on the face of the Complaint that he rode through a stop sign, into an intersection, and was struck by a

16

vehicle and injured as a result." ECF No. 10-1 at 30. Mr. Pierson, for his part, argues that the choice of law clause is broad enough to encompass the question of whether contributory or comparative negligence applies here, and that either way dismissal at the pleadings stage would be inappropriate given his allegations as a whole.

The Court need not decide these issues at this stage. Because the Court is dismissing counts 5 and 6 on exculpatory clause grounds, it need not decide whether those counts would alternatively be subject to dismissal on other grounds. Moreover, Defendants have only moved for dismissal on contributory negligence grounds of Plaintiff's negligence claims, not his gross negligence claims. ECF No. 10-1 at 30 ("Plaintiff's Contributory Negligence Bars His Negligence Claims"). And even if Defendants had argued that the gross negligence claims should be barred under contributory or comparative negligence, the facts in Plaintiff's complaint allege that he was not at all negligent but merely followed the instruction of the race officials to not stop at the intersection. Thus, the Court need not decide at this stage, for example, whether Maryland or Colorado law applies to Defendants' comparative/contributory negligence defense or whether that defense under either state's law applies to gross negligence claims. Depending on how the evidence develops during discovery, the Court may need to resolve those disputes at the dispositive motions stage. But because Plaintiff's gross negligence claims will be proceeding to discovery regardless, the Court need not resolve those disputes for now.

### III. CONCLUSION AND ORDER

For these reasons, although Plaintiff's gross negligence claim may proceed to discovery, his other claims are subject to dismissal based on the exculpatory provisions in the applicable contractual documents. Accordingly, the Court hereby ORDERS that:

1.      Defendants' Motion To Dismiss Or In The Alternative For Summary Judgment, ECF No. 10, is GRANTED IN PART and DENIED IN PART; and

2.      Defendants shall file answers pertinent to Plaintiff's gross negligence counts within 14 days of this Order.

Date:  January 15, 2026                             /s/
                                                             _____
                                                             Adam B. Abelson
                                                             United States District Judge